1997 ME 81

**STATE of Maine**

v.

**Leslie J. TAYLOR.**

Supreme Judicial Court of Maine.

Argued Nov. 7, 1996.

Decided April 18, 1997.

Stephanie Anderson, District Attorney and Carlos Diaz, Asst. Dist. Atty. (orally), Portland, for the State.

Anthony J. Sineni, III (orally), Portland, for defendant.

Before WATHEN, C.J., and ROBERTS, GLASSMAN, CLIFFORD, RUDMAN, DANA and LIPEZ, JJ.

CLIFFORD, Justice.

[¶ 1] Leslie J. Taylor appeals both from the order entered in the Superior Court (Cumberland County, Delahanty, J.) denying his motion to suppress evidence and from the judgments entered against him following jury verdicts of guilty on the charges of operating under the influence (Class D) in violation of 29 M.R.S.A. § 1312–B (Supp. 1994),[1] and operating after having been declared a habitual offender (Class D) in violation of 29 M.R.S.A. 2298 (Supp.1994).[2] Taylor contends on appeal that the Superior Court committed error in denying his motion to suppress evidence obtained from the vehicle stop and admitting in evidence expert testimony regarding the Horizontal Gaze Nystagmus (HGN) test. We affirm the judgments.

[¶ 2] On September 3, 1994, at about 1:00 a.m., Officer Mark Green was patrolling in Brunswick. Officer Green saw Taylor's car from a distance of about seventy-five feet and observed that the rear license plate was unilluminated. After stopping Taylor's car, Officer Green approached Taylor, explained his reason for doing so, and asked Taylor for his license. Taylor apologized for the light being out and said that he was unaware that the light was defective. Officer Green noted that Taylor had an odor of alcohol on his breath and that his speech was slow and thick. Taylor told Officer Green that he had consumed one beer about one and one-half hours earlier.

[¶ 3] Taylor performed four sobriety tests after exiting the car. While attempting to recite the alphabet, Taylor correctly stated the order of the letters but paused twice during the recital. When performing the walk-and-turn test, Officer Green observed that Taylor did not count his steps out loud as requested, stepped off-line once, incurred balance problems, and did not turn as Officer Green had requested. Taylor put his leg down, swayed, and lost count while attempting to perform the one-leg stand.

[¶ 4] Officer Green also administered an HGN test, which detects the presence of involuntary jerking of the eyes. During each of the three phases of the test, Officer Green observed jerking in both of Taylor's eyes. Officer Green testified that, as a result, Taylor had six "clues" of intoxication. At the conclusion of the sobriety tests, Officer Green placed Taylor under arrest for driving under the influence of alcohol. At the police station, Taylor refused to take a breathalyzer test. Officer Green never cited Taylor for a

---

1. 29 M.R.S.A. § 1312–B provided in part:
   **1. Offense.** A person is guilty of a criminal violation under this section if he operates or attempts to operate a motor vehicle:
   **A.** While under the influence of intoxicating liquor or drugs or a combination of liquor and drugs; or
   **B.** While having 0.08% or more by weight of alcohol in his blood.
   **1–A. Pleading and proof.** The alternatives defined in subsection 1, paragraphs A and B may be pleaded in the alternative. The State may, but shall not be required to, elect prior to submission to the fact finder.
   This section was repealed and replaced by 29–A M.R.S.A. § 2411 (1996) (effective Jan. 1, 1995).

2. 29 M.R.S.A. § 2298 was repealed and replaced by 29–A M.R.S.A. § 2557 (1996) (effective Jan. 1, 1995).

broken plate light, and both Taylor and his girlfriend, who was in the car with him, testified that the light was working when they checked it later at the station.

[¶ 5] Taylor was indicted for operating a motor vehicle after his right to operate had been revoked pursuant to the habitual offender law, 29 M.R.S.A. § 2298 (Supp.1994), and for operating under the influence 29 M.R.S.A. § 1312–B (Supp.1994). After entering pleas of not guilty, Taylor moved to suppress evidence alleging that it was the product of an illegal stop. After a hearing, the court denied the motion based on Officer Green's testimony that he observed that the light was defective.

[¶ 6] At the jury trial, Taylor moved in limine to exclude the HGN results because no case law or scientific foundation proved its reliability. The State directed the court's attention to *State v. Superior Court,* 718 P.2d 171 (Ariz.1986) (en banc), and the scientific evidence cited in that case, to show the reliability of the HGN test. The court denied Taylor's motion and concluded that it would allow expert testimony at trial on the HGN test subject to the laying of an adequate foundation.

[¶ 7] Officer Green testified that he had taken a three-day course which included the horizontal gaze nystagmus testing procedure and was taught by instructors at the Maine Criminal Justice Academy. He testified that the HGN test "deals with the eyes ... [A]s a person's intoxication level increases, there is a distinct involuntary jerkiness of the eyes which can be detected. And my training consisted of picking up that or detecting that nystagmus out there in the field or on the road." Officer Green reported that the National Highway Traffic Safety Administration recognizes the test. Officer Green testified that, in his experience and training, four or more "clues" correlates with a 77 percent probability that the subject will test .10% blood alcohol by weight or higher. He also testified that in his experience in testing hundreds of people, only once or twice had

someone had six clues but a blood alcohol level of less than .10%.

[¶ 8] Officer Green also testified that he knows how to administer the test properly although he is unaware of the scientific basis for it. The person administering the test uses a pen to check for involuntary jerking of each of the eyes, which results in "clues" of intoxication. There are three parts to the test, and the officer looks for as many as six clues. First, the officer checks for lack of smooth pursuit of the eyes by bringing a pen back and forth in front of the subject's eyes. Second, the officer checks for maximum deviation of the eyes by bringing them out to the very extremes that they can travel in the eye socket. Finally, the officer brings the subject's eyes out forty-five degrees to observe at what point any involuntary jerking of the eyes begins. All of the evidence relating to the HGN test was admitted over Taylor's timely objections during the trial. Before the charge to the jury, the court granted in part a motion for a judgment of acquittal on part of the indictment alleging that Taylor's blood alcohol level was over .08%.[3] The jury subsequently convicted Taylor on both counts. This appeal followed.

## I.

[¶ 9] Taylor contends that the court erred in finding Officer Green had an objective basis for stopping Taylor's vehicle. He argues that Officer Green was factually incorrect and that the license plate light was illuminated. An investigatory stop is valid when it is "supported by specific and articulable facts which, taken as a whole and together with the rational inferences from those facts, reasonably warrant the police intrusion." *State v. Hill,* 606 A.2d 793, 795 (Me.1992) (citations omitted). Suspicion of a civil violation provides adequate specific and articulable facts. *Id.* (failure to display rear plate) *State v. Carsetti,* 536 A.2d 1121, 1122 (Me.1988), habeas corpus denied, 932 F.2d 1007 (1st Cir.1991) (partially obstructed plate

---

**3.** During its instructions to the jury, the court indicated that "there is no evidence of a blood alcohol test or as to what the defendant's blood alcohol level was at that time, and you should not speculate as to what it would have been if a test in fact had been taken." During jury deliberations and at the request of the jury, a section of testimony concerning how many clues of intoxication Taylor showed in the eye test was read back to the jury.

and expired registration sticker); cf. *State v. Pinkham*, 565 A.2d 318, 319 (Me.1989) (safety reasons alone may be sufficient to warrant an investigatory stop). Although Taylor testified that the light was illuminated when he checked it after leaving the police station, Officer Green testified that he observed from seventy-five feet away that the light was defective.[4] Officer Green's testimony about whether the light was illuminated while Taylor operated his car is not directly controverted and supports an articulable and reasonable suspicion that a traffic violation was occurring.[5] The court chose to accept Officer Green's testimony. Because those factual findings are not clearly erroneous, the stop in this case was constitutional.[6]

## II.

[¶ 10] Taylor also contends that the court erred in allowing Officer Green to testify regarding the results of the HGN test that the officer administered to Taylor during the stop and that as a consequence, he was improperly convicted of OUI. We review evidentiary rulings for clear error and an abuse of discretion. See *Kay v. Hanover Ins. Co.*, 677 A.2d 556, 559 (Me.1996). Although we agree with Taylor that the court erred in admitting some of the HGN testimony, we conclude that the error in this case was harmless.

M.R. Evid. 702 provides that:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

We stated in *State v. Williams*, 388 A.2d 500 (Me.1978), that

[t]he presiding Justice will be allowed a latitude, which the Frye rule denies, to hold admissible in a particular case proffered evidence involving newly ascertained, or applied, scientific principles which have not achieved general acceptance in whatever might be thought to be the applicable scientific community, if a showing has been made which satisfies the Justice that the proffered evidence is sufficiently reliable to be held relevant.

*Id.* at 504 (citing *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923)). The HGN test is an integral part of a police officer's administration of the field sobriety test, and we take judicial notice of its reliability in making determinations of probable cause for arrest and for purposes of establishing criminal guilt in cases involving operating under the influence. This Court may properly take judicial notice on appeal. M.R.Evid. 201(f). "A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by

---

4. 29 M.R.S.A. § 1366 (Supp.1994) provided in part that "[a] vehicle shall carry a lamp illuminating with white light its rear registration plate so that the characteristics on the plate shall be visible for a distance of at least 50 feet." (*repealed and replaced* by 29–A M.R.S.A. § 1909 (1996) (effective Jan. 1, 1995)).

5. Taylor's assertion that Officer Green had a duty to verify that the light was out before continuing with the *Terry*-stop is without merit. In *State v. Hill*, 606 A.2d 793 (Me.1992), the officer stopped Hill's truck because of the officer's belief that Hill was not displaying a rear license plate. Prior to reaching the cab of the truck, however, the officer noticed an unilluminated license plate in the cab's rear window. We held that the officer's subsequent request for Hill's license and registration was valid. Here, Officer Green made his initial observations about Taylor's intoxication after the officer asked Taylor for his

license. Thus, even if Officer Green failed to verify his suspicion, Hill forecloses any argument that his subsequent request for a license was improper.

6. Taylor also argues that the stop was unconstitutional because it was pretextual. Taylor did not raise this argument below, and accordingly, we review that contention for obvious error. *State v. Sargent*, 656 A.2d 1196, 1199 (Me.1995) (citations omitted). There was no obvious error in the court's implicit finding that the stop was not pretextual. Even assuming, however, that the officer's reason for stopping Taylor was a pretextual one, we note that the United States Supreme Court has recently held that the subjective motivations of the officer are irrelevant for purposes of Fourth Amendment analysis. *Whren v. United States*, ―― U.S. ――, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996).

resort to sources whose accuracy cannot be questioned." M.R.Evid. 201(b).[7]

[¶ 11] We are convinced that the Horizontal Gaze Nystagmus test is sufficiently reliable to be admitted as evidence in future cases. Nystagmus "is an involuntary jerking of the eyeball. The jerking may be aggravated by central nervous system depressants such as alcohol or barbiturates." *State v. Superior Court,* 149 Ariz. 269, 718 P.2d 171, 173 (1986) (en banc). "Horizontal gaze nystagmus is the inability of the eyes to maintain visual fixation as they are turned to the side." *Id.* As one commentator explains,

> [nystagmus] occurs naturally as one's eyes focus on all objects within their field of vision. In order to give the impression of imagery in motion, the eyes focus on each and every object individually and then track the sequence of objects at a high rate of speed. As a result, many people show horizontal nystagmus as their eyes track objects to the extreme sides. Alcohol slows down the eyes' ability to rapidly track objects and causes the eyes to oscillate, or "jerk," before they normally would in a sober person.

Stephanie E. Busloff, Can Your Eyes be Used Against You? The Use of the Horizontal Gaze Nystagmus Test in the Courtroom, 84 J.Crim. Law & Criminology 203, 203 (1993); see also John P. Ludington, Annotation, Horizontal Gaze Nystagmus Test: Use in Impaired Driving Prosecution, 60 A.L.R.4th 1129 (1988 & Supp.1996).[8] Because the test examines involuntary movements and not speech or physical impairment, the United States Department of Transportation considers the test "the single most accurate field test[.]" See *People v. Buening,* 229 Ill.App.3d 538, 170 Ill.Dec. 542, 547, 592 N.E.2d 1222, 1227 (1992), cert. denied, 146 Ill.2d 634, 176 Ill.Dec. 806, 602 N.E.2d 460 (1992) (citations omitted). Al-

though the test does not require scientific explanation to the same extent as a breathalyzer or a blood test, several courts have distinguished it from other routine field sobriety tests such as the walk-and-turn and the one-leg stand. See *Schultz v. State,* 106 Md.App. 145, 664 A.2d 60, 65–66 (1995) ("The principle underlying the HGN test, i.e., that it is an accurate measure of the intoxication of a suspect, is a scientific principle."); *State v. Superior Court,* 718 P.2d at 178 ("The HGN test is a different type of test from balancing on one leg or walking a straight line because it rests almost entirely upon an assertion of scientific legitimacy rather than a basis of common knowledge). We agree that the HGN test relies on scientific principles to a greater extent than other common field sobriety tests such as the walk and turn, the one-leg stand, or a recitation of the alphabet. Therefore the HGN test's reliability must be established before its results are admissible in evidence in a criminal trial.

[¶ 12] The seminal case regarding the admissibility of HGN test results is *State v. Superior Court,* 149 Ariz. 269, 718 P.2d 171 (1986) (en banc). Several cases subsequently have relied on Superior Court to judicially notice the reliability of the test in their jurisdictions. See *Schultz v. State,* 664 A.2d at 74; *People v. Berger,* 217 Mich.App. 213, 551 N.W.2d 421, 424 (1996); *Emerson v. State,* 880 S.W.2d 759, 768–69 (Tex.Crim.App.1994) (en banc), cert. denied 513 U.S. 931, 115 S.Ct. 323, 130 L.Ed.2d 284 (1994); cf. *People v. Buening,* 170 Ill.Dec. at 547, 592 N.E.2d at 1227; *State v. Armstrong,* 561 So.2d 883, 886–87 (La.Ct.App.1990). The scientific studies, law review articles, and other literature on the subject of HGN testing, as well as the case law, demonstrate that the HGN test is reliable if an officer properly administers it. We are persuaded by these authorities and conclude that the results of the HGN test should be admissible if a proper

---

7. We have judicially noticed scientific conclusions in the past. See, e.g. *State v. Inman,* 350 A.2d 582 (Me.1976) (reliability and common knowledge of palm print identification); *Kobeckis v. Budzko,* 225 Me.2d 418 (Me.1967) (that cooking pork protects from trichinosis is a matter of general knowledge); *Jordan v. Mace,* 144 Me. 351, 69 A.2d 670 (1949) (scientific authorities show that blood tests can accurately disprove

paternity); see generally, Field & Murray, Maine Evidence § 201.2, 201.3 at 2–4 to 2–7 (1992).

8. The United States Supreme Court has called the HGN test a "standard field sobriety test." *Pennsylvania v. Muniz,* 496 U.S. 582, 585, 110 S.Ct. 2638, 2641–42, 110 L.Ed.2d 528 (1990).

foundation is laid for their introduction in evidence. A proper foundation shall consist of evidence that the officer or administrator of the HGN test is trained in the procedure and the test was properly administered.[9]

■ [¶ 13] What the test may be admitted to prove, however, should be limited. We agree with Taylor that using HGN results to precisely quantify blood alcohol content is improper. Pursuant to 29 M.R.S.A. § 1312(8) (Supp.1994), the Maine Legislature had provided that

> 8. **Evidence.** The drug concentration or percentage by weight of alcohol in the defendant's blood at the time alleged, as shown by the chemical analysis of that person's blood, breath or urine, or by results of a self-contained, breath alcohol testing apparatus authorized . . . is admissible in evidence.[10]

The statute suggests that the proper way to test for an exact blood alcohol level is by chemical analysis of blood, breath, or urine. In distinguishing those tests from the HGN test, the court in *State v. Superior Court* realized that blood-alcohol levels tested under these methods "is to be determined deductively from analysis of bodily fluids, not inductively from observation of involuntary bodily movements." 718 P.2d at 181. Because no one can verify the officer's HGN test reading and because we are cognizant that there are other possible causes of nystagmus,[11] the results of an HGN test are admissible only as evidence supporting probable cause to arrest without a warrant or as circumstantial evidence of intoxication. The HGN test may not be used by an officer to quantify a particular blood alcohol level in an individual case. See *People v. Buening*, 170 Ill.Dec. at 547–48, 592 N.E.2d at 1227–28; *Schultz v. State*, 664 A.2d at 73–74; *Emerson v. State*, 880 S.W.2d at 769.

■ [¶ 14] Thus, the admission in this case of Officer Green's testimony relating to particular blood alcohol levels was error. Officer Green testified that four clues of intoxication resulted in a 77 percent probability that the subject has a blood alcohol level in excess of .10%. He further testified that, in his experience in testing over two hundred people, only a few of those persons exhibiting six clues did not have a blood alcohol level of .10% or above. Although Officer Green did not exactly quantify Taylor's blood alcohol level to any specific number, he improperly testified to evidence which lacked scientific basis. See, e.g., *State v. Ruthardt*, 680 A.2d 349, 362–63 (Del.Super.Ct.1996) (noting that mere estimate by officer that blood alcohol level exceeded .10% would be error).

■ [¶ 15] Given the amount of other evidence pointing to Taylor's intoxication, however, we are persuaded that the error is harmless. M.R.Crim.P. 52(a). An error is harmless "if it is highly probable that the error did not affect the jury's verdict." *State v. Phillipo*, 623 A.2d 1265, 1268 (Me.1993) (citing *State v. True*, 438 A.2d 460, 467 (Me. 1981)). Taylor admitted consuming alcohol and had an odor of alcohol on his breath. He performed poorly on the walk-and-turn test, the one-leg stand test, and reciting the alphabet. His speech was slow and thick. Taylor then refused to take a breathalyzer test at the station.[12] Moreover, the court entered a judgment of acquittal on the charge of oper-

---

9. Officer Green was qualified to testify as an expert on the HGN test. He was trained at a three-day course taught by instructors and has tested numerous subjects both in the field and in controlled situations. Thus, Officer Green is qualified by both his training and experience. M.R. Evid. 702.

10. Section 1312(8) was repealed and replaced by 29–A M.R.S.A. § 2521 (1996), which states

> § 2521. **Implied consent to chemical tests**
> 1. **Mandatory submission to test.** If there is probable cause to believe a person has operated a motor vehicle while under the influence of intoxicants, that person shall submit to and

complete a test to determine blood-alcohol level and drug concentration by analysis of blood, breath, or urine.

See also 29–A M.R.S.A. § 2431(1) (1996) (results admissible in evidence).

11. *State v. Superior Court*, 718 P.2d at 181 (noting that arresting officer's conclusion essentially is unreviewable); *Schultz v. State*, 664 A.2d at 77 (noting thirty-eight other possible causes of nystagmus).

12. The jury was entitled to consider Taylor's failure to take a chemical test as evidence of his criminal guilt. See *State v. Pineau*, 491 A.2d 1165, 1167 (Me.1985).

ating with a blood alcohol level of .08% or greater. Although the jury asked for the number of HGN clues to be read back to them, the court had previously cautioned them in its instructions that there was no evidence as to Taylor's specific blood alcohol level. Given that the jury had abundant circumstantial evidence of intoxication even without the HGN test, it is highly probable that the HGN evidence did not affect the jury's verdict.

The entry is:

Judgments affirmed.

